**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Marissa Walz,

Plaintiff,

v.

Ameriprise Financial, Inc.,

Defendant.

Civ. No. 13-779 (RHK/SER)

**MEMORANDUM OPINION AND ORDER**

---

Mark A. Greenman, Law Office of Mark A. Greenman, Minneapolis, Minnesota, for Plaintiff.

Melissa Raphan, Christopher A. Amundsen, Dorsey & Whitney LLP, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

In this action, Plaintiff Marissa Walz alleges her former employer, Defendant Ameriprise Financial, Inc. ("Ameriprise"), discriminated against her on the basis of her disability by failing to accommodate her and terminating her employment, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12201 et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 et seq. Ameriprise now moves for summary judgment and, for the reasons explained below, its Motion will be granted.

## BACKGROUND

The following facts, though largely undisputed, are recited in the light most favorable to Walz.

Walz was employed by Ameriprise from 1996 through 2012. In general, she was a good employee and her performance reviews were mostly positive. She has Bipolar I Disorder, which is characterized by extreme mood swings from depression to mania that may cause significant difficulty in one's job or relationships. Manic episodes can be severe or dangerous and the symptoms, which vary for each individual, may include poor judgment, rapid speech, racing thoughts, aggressive behavior, agitation or irritation, delusions or a break from reality, and poor performance at work. Walz has been hospitalized with mania approximately six times in her life. Between 2005 and 2011, she took several leaves of absence from Ameriprise, three of which she attributes to her disorder.

In 2011, Walz was recruited by her former supervisor, David Beltman, to work in the newly formed Enterprise Operations Support Department as a Process Analyst II. In that position, Walz worked to build consensus among many individuals and departments in order to standardize Ameriprise's letters to its customers and wholesalers. She acknowledges that one aspect of her position was maintaining good relationships with others within the company. Beltman supervised her directly in this role until February 2012, when he hired Thad Radel to take over supervision.

One month later, in March 2012, Walz had a serious flare-up of her disorder and was extremely manic. She had not disclosed her disorder to anyone at work,[1] but her

[1] Walz alleges that she informed the company Ombudsman about her bipolar disorder approximately one year after she began working for Ameriprise and asked him for guidance about whether to disclose it. According to Walz, he advised her not to, suggesting it could keep her from advancing in the company, and she followed his advice, never disclosing her disorder to

symptoms affected her conduct at work and Radel and Walz's coworkers noticed the change. On Friday, March 16, Radel and Walz were in a meeting with the marketing department when Walz turned to a coworker and said, "Stop interrupting me; you don't know what you're talking about," and then stood up and began scribbling notes on the white board "in an aggressive, fast, and illegible manner." (Walz Decl. Ex. A.) Radel states he ended the meeting early because of her conduct. (Radel Aff. ¶ 4.) After that, he began documenting her behavior. (See Walz Decl. Ex. A.)[2]

The following Monday, several coworkers complained to Radel that Walz had upset them. Walz had confronted one worker about an email in a manner that made that coworker uncomfortable. Another coworker, Shannon Hargrove, emailed Radel about Walz, describing her as "manic," "[t]alking very rapidly and not making sense," "[v]ery excited and easily agitated," "sending e-mails that do not make sense," "not acting like herself," and had started to cry. (Walz Decl. Ex. A.) Hargrove informed Radel that, during her meeting with Walz, Walz had called him (Radel) a "puppet" and said that the leadership in their department only hires their friends instead of qualified people. (Id.) She told Hargrove that she did not know who to trust, people were trying to take her and Hargrove's jobs, and several coworkers hated her (Hargrove). (Id.) Hargrove expressed

---

Ameriprise. She does not provide the name of this Ombudsman or any further details on the matter.

[2] Although Walz does not recall many of the statements and actions attributed to her by Radel, she does not definitively deny them and she cites his documentation as evidence of what occurred in her Memorandum. (See, e.g., Walz Dep. at 206–211, 230–36 (variably stating she did not recall, or did "not think" she said, or "might have" said the statements Radel attributed to her in his log); Pl.'s Mem. at 4–7 (quoting and citing Radel's log as evidence of what occurred).) Accordingly, where Walz does not deny Radel's version of events or supply any contradictory version of her own, the Court takes his version as true for the purposes of this Motion.

concern that Walz was "not representing [the] department well and that her work [was] suffering." (Id.) Other coworkers expressed concern to Radel that Walz was "acting out of character," was not her usual "calm and professional" self, seemed "manic," and needed help. (Id.) Radel also noted in his log of Walz's behavior that she was sending emails that did not make sense and her behavior was erratic.

Radel confronted Walz to discuss her conduct and she began complaining about him, senior leadership, and her coworkers. According to Radel, she told him, "No one thinks your position is necessary and I am already doing leadership duties on the team. No one knows why Dave hired you. There is no sense of direction since you came on board." (Id.) She also relayed that a coworker had said he was "Dave's puppet." (Id.) After speaking with someone from Human Resources ("HR") about Walz's behavior, he encouraged Walz to leave for the day, but she refused, saying, "I don't need to take any time off." (Walz Decl. Ex. A.) As she was manic at the time, she did not recognize that her behavior was inappropriate. (Walz Decl. ¶ 2.)

The next morning, Radel spoke with Walz's husband. According to Radel, her husband said she was exhausted due to an incident with their dog and a special diet Walz was on. But according to her husband, he told Radel she was dealing with a medical condition. Radel spoke with Walz directly to express concern about her stress level and asked if there was anything he could do. During their meeting, she was aggressively taking notes. Then she told him she "need[ed] to know [her] priorities" and had an important meeting to get to. (Walz Decl. Ex. A.) She said, "Why don't you just fire me, I want to watch people work and get them water," and then left. (Id.) Two people

present at her subsequent meeting with the risk management department emailed Radel about her behavior, describing her as defensive, erratic, and unintelligible, and informing him that she left the meeting after only fifteen minutes or so, even though she was the one who had convened it. (Id.)

Radel spoke with Walz again to ask what was bothering her and offer help. According to Radel's log, she told him to just look her in the eye and fire her, but he responded that was not his aim. (Id.) She raised her voice, he told her she was acting inappropriately, and she asked if this was her verbal warning. Radel replied, "No," and Walz said, "I use[d] to train leaders on doing what you are trying to do to me." (Id.) In her deposition, Walz recalled him stopping by her desk to speak with her but could not specifically recall what either of them said. Afterward, Radel received several more complaints and emails expressing concern over Walz's behavior and her vocal criticisms of the leadership team.

Radel spoke with HR and they agreed to issue Walz a behavioral warning. (See Radel Aff. Ex. 2.) The warning summarized her conduct over the preceding week and notified her that she faced immediate termination if she acted inappropriately again. (Id.) After they issued the warning, Walz requested several days off work, which she was granted. Walz then applied for FMLA leave to the third-party vendor that handles such requests for Ameriprise. The vendor granted her request, informing Ameriprise that she was approved for leave without specifying the reason.

She returned from leave on April 16, 2012, and gave Radel a note from her doctor clearing her for work. The note, from Allina Mental Health Services, says, "Ms. Waltz

[*sic*] has been off work (per her report) since March 22, 2012. She has been stabilizing on her medication and has been attending outpatient treatment. She will be able to return to work (maximum of forty hours per week) on April 16th, 2012." (Walz Decl. ¶ 3 & Ex. G.) She also submitted a six-page rebuttal to her behavioral warning. Radel had her review and sign Ameriprise's Individual Treatment Policy, which describes the company's prohibition on discrimination and encourages employees with disabilities to speak to their supervisors or HR about any accommodations they might need. For the next three months, Walz had no further behavioral problems.

In July 2012, her mania returned. On Friday, July 27, Walz disrupted a meeting by interrupting her coworkers and aggressively talking over them. (Id. Ex. H.) Radel met with her immediately afterward to tell her that her conduct was too aggressive. (Id.) Radel states he offered her time off, but Walz denies this. On Tuesday, July 31, Walz again disrupted a meeting by talking over others, refusing to let them finish, and intimidating people who did not agree with her. Several of her coworkers approached Radel to discuss Walz's conduct; one stated it was so stressful working with Walz that she was having a hard time sleeping and dreaded coming to work. (Radel Aff. Ex. 7.)

Radel met with Beltman and Eileen Anderson, a senior manager in HR, to discuss Walz's conduct. With their guidance, he decided to terminate Walz's employment and met with her August 1, 2012, to inform her of this decision. Three days later, she was hospitalized for mania. In 2013, Walz commenced the instant action alleging Ameriprise discharged her because of her bipolar disorder and failed to accommodate her, in violation of the ADA and MHRA. Ameriprise now moves for summary judgment.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

The ADA and MHRA prohibit discrimination against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a); Minn. Stat. § 363A.08.[3] Although somewhat unclear from the submissions, it appears Walz claims Ameriprise discriminated against her in two ways: by terminating her based on her bipolar disorder and by failing to accommodate her disorder through medical leave.

---

[3] For all purposes relevant to this Order, claims under the ADA and MHRA are analyzed in the same fashion; accordingly the Court's analysis encompasses Walz's claims under both statutes. See Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001) ("Claims under the MHRA are analyzed the same as claims under the ADA.").

## I. Wrongful Termination

To prove a wrongful-termination claim, Walz must show: (1) she is a qualified individual with a disability, as defined by the ADA and/or MHRA; (2) she suffered an adverse employment action; and (3) the adverse action was based on her disability. Henderson v. Ford Motor Co., 403 F.3d 1026, 1034 (8th Cir. 2005). Ameriprise does not dispute that Walz is a qualified individual and disabled by virtue of her bipolar disorder. Nor does it dispute that she suffered an adverse employment action. Instead, Ameriprise maintains Walz cannot show her termination was based on her disability because the decision makers were unaware of it. And it argues it was entitled to terminate her employment based on her misconduct, regardless of whether such conduct was caused by her disability.

The Court need not address the former argument, as the latter is dispositive. Assuming (without deciding) Walz has created a genuine issue of fact as to whether Radel knew she was disabled and assuming her conduct was symptomatic of her disability, Ameriprise was nonetheless entitled to dismiss her. "As a general rule, an employer may not hold a disabled employee to precisely the same standards of conduct as a non-disabled employee *unless such standards are job-related and consistent with business necessity*." Den Hartog v. Wasatch Acad., 129 F.3d 1076, 1086 (10th Cir. 1997). That is, an employer must make reasonable accommodations for a disabled employee, but need not tolerate misconduct that would result in termination of a non-disabled employee. See Harris v. Polk Cnty., Iowa, 103 F.3d 696, 697 (8th Cir. 1996) (employers may hold disabled employees to the same standards of law-abiding conduct

as other employees, therefore it was *not* discriminatory for the employer to refuse to hire the plaintiff based on a shoplifting conviction caused by mental illness); Breiland v. Advance Circuits, Inc., 976 F. Supp. 858, 865 (D. Minn. 1997) (Doty, J.) (ADA does not require employers to ignore employees' violation of workplace policies).

The EEOC always considers certain conduct standards job-related and consistent with business necessity, including prohibitions on violence and insubordination as well as requirements that "employees show respect for, and deal appropriately with, clients and customers." EEOC, *Applying Performance and Conduct Standards to Employees with Disabilities* § III(B)(9) (Jan. 20, 2011), http://www.eeoc.gov/facts/performance-conduct.html#conduct. But generally, whether a conduct standard meets this test requires a fact-specific inquiry and depends on factors such as the symptom of the disability affecting the employee's conduct, the nature of the job, the specific conduct at issue, and the working environment. Id. For example, a man who barks or shouts loudly due to his Tourette Syndrome may be dismissed from a position as a bank teller when customers and coworkers complain because his disability-caused behavior is disruptive to coworkers and interferes with his ability to serve customers. Id. On the other hand, he may not be legally dismissed for those same behaviors if he is employed in a noisy warehouse where he does not work with customers and his vocalizations do not distract coworkers—regardless of whether his coworkers may be uncomfortable with him. Id.

Here, Walz's job entailed maintaining good relationships with other departments in the company. So requiring her to act appropriately and courteously toward coworkers

was job-related and consistent with business necessity. Walz's disrespectful and aggressive behavior breached this standard.

Her behavior toward Radel—abruptly ending their meeting, challenging him to fire her, refusing to go home early—was combative and insubordinate. Her comments to him that he was "Dave's puppet," no one knew why Dave hired him, and his position was not necessary, as well as her comments about senior management, were also insubordinate. Requiring Radel to tolerate such behavior from her would only serve to undermine his authority and engender resentment from coworkers who are not permitted such trespasses. Her behavior toward coworkers and in meetings was disruptive. It prompted several coworkers to speak with Radel about her. One complained that Walz was not representing the department well and her work was suffering. Another was purportedly so stressed out by Walz's conduct that she dreaded coming to work. As her behavior violated reasonable, job-related conduct standards, Ameriprise did not discriminate against Walz by warning, and then terminating, her for it. Cf. id. § III(B)(10) (employer entitled to terminate employee with bipolar disorder who yells and curses at supervisor even if conduct was caused by employee's disability); Rask v. Fresenius Med. Care N. Am., 509 F.3d 466, 470 (8th Cir. 2007) (technician who could not come to work on a regular and reliable basis because of disability was not qualified for her position); Buckles v. First Data Resources, Inc., 176 F.3d 1098, 1101 (8th Cir. 1999) (employee with frequent disability-caused absences was not qualified for her position); see also Harris, 103 F.3d at 697 ("We agree with the courts of appeal that recognize an employer may hold disabled employees to the same standard of law-abiding

conduct as all other employees."); Gambini v. Total Renal Care, Inc., 486 F.3d 1087, 1095 (9th Cir. 2007) (upholding jury instruction that employee may be subject to adverse employment action based on disability-caused conduct if employer shows business necessity); Calef v. Gillette Co., 322 F.3d 75, 87 (1st Cir. 2003) (ADA does not require employer to tolerate verbal and physical threats and altercations, even if caused by a disability).[4]

## II. Failure to Accommodate

Walz also claims Ameriprise discriminated against her by failing to accommodate her disability. "An employer commits unlawful discrimination . . . if the employer does 'not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" Fjellestad v. Pizza Hut of

[4] To the extent the Eighth Circuit has addressed how employers may apply conduct standards to disabled employees, it has done so in the context of deciding whether the employee was a "qualified individual"—that is, whether the disabled employee was able (with reasonable accommodation) to perform all of the essential functions of the relevant position. It has determined on at least three occasions that an employee was not "qualified" for a position because of his or her disability-caused conduct—twice for excessive absences and once for a criminal record. See Rask, 509 F.3d at 470; Buckles, 176 F.3d at 1101; Harris, 103 F.3d at 697. The Court believes Walz *was* qualified for her position, given that she performed satisfactorily for more than ten years. Instead of viewing her disability-caused misconduct as disqualifying her from the position and defeating an essential element of her claim, the Court views Ameriprise's argument that she was terminated for violating *job-related* conduct standards as a legitimate non-discriminatory reason for its action, see Brown v. City of Jacksonville, 711 F.3d 883, 888–89 (8th Cir. 2013) (using McDonnell Douglas framework for ADA claims), or alternatively as an affirmative defense, similar to the "direct threat" defense articulated in EEOC v. Wal-Mart Stores, Inc., 477 F.3d 561, 571–72 (8th Cir. 2007). But under any of the methods of analysis, the result is the same: Ameriprise has proved as a matter of law that it did not discriminate against her.

Am., Inc., 188 F.3d 944, 951 (8th Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)). If a disabled employee requests accommodation, then "the employer must engage in an interactive process to determine whether reasonable accommodations are possible." Buboltz v. Residential Advantages, Inc., 523 F.3d 864, 870 (8th Cir. 2008), abrogated on other grounds by Torgerson, 643 F.3d 1031. If they are, the employer must accommodate the employee. Id.

But "[i]f an employee fails to make a request for accommodation, the employer has no duty." Id.; see also Ballard v. Rubin, 284 F.3d 957, 960 (8th Cir. 2002) (employer has no duty to accommodate if the employee fails to request accommodation). This is where Walz's claim falters—she never requested accommodation.[5] Instead, she contends that Ameriprise should have "forced" her to take leave instead of dismissing her. (Pl.'s Mem. at 21.) Essentially, she is asking the Court to conclude the ADA requires an employer to independently detect an employee's disability, determine what accommodation is appropriate, and force the employee to comply. But she has provided no legal authority for this proposition and its policy implications are problematic to say the least. Accordingly, the Court declines to adopt Walz's contention and, as she has failed to prove an essential element of her claim, will instead grant summary judgment.

[5] To be more precise, she did not request accommodation for her manic episode in July/August of 2012, which precipitated her termination, or for her disability in general (unsurprising, given that she never disclosed it). However, the record indicates she requested time off from Ameriprise on several occasions throughout the course of her employment, often due to her disability (although she did not notify Ameriprise of the reason), and these requests were granted—including, for example, her requests for days off and then FMLA leave during her manic episode in March 2012.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Ameriprise's Motion for Summary Judgment (Doc. No. 50) is **GRANTED** and the Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 22, 2014

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge